Next case is Figueroa v. Attorney General. I know I mispronounced your name, so I'll allow you to introduce yourself. I'm sorry. Completely fair. May it please the Court, my name is Rachel Kummer. Kummer. And I represent the petitioner, Mr. Adil Galeas-Figueroa. I respectfully request three minutes for rebuttal. Granted. Your Honors, it is undisputed in this case that Mr. Galeas-Figueroa faces a, quote, of future harm if he is once again returned to Honduras because of his membership in the social group, family members of Juan Joel Galeas-Figueroa, who was his father. The facts in this case are extreme and very upsetting. Mr. Galeas-Figueroa's father, uncle, and two cousins were all murdered by the 18 gang in Honduras. The gang members armed, raped his sister. The gang members threatened to cut out his younger brother's tongue and to kill his younger brother. They shot up his home. They killed his dog. They stalked him through three different cities in Honduras, captured him, beat him so severely with a belt that he is permanently scarred, and they threatened to kill him on multiple occasions, both directly and relayed through his mother. The record reflects that the Galeas-Figueroa family reported his sister's rape, the four murders of their family members, and the threatened abduction of his children to the Honduran police, but that beyond occasionally filling out an intake form labeled police investigation request, the Honduran police did nothing. Even where they knew the name of the alleged assailants, as they did with respect to his sister's rape and the threatened abduction of his children, they made no arrests, and the record reflects no investigation of any type. Your Honors, on this record, it is clear that the Honduran government is unable or unwilling to protect Mr. Galeas from the clear probability of future harm that he faces if returned to Honduras. The Board of Immigration Appeals erred because it applied the wrong legal standard in his case. He is not required under this court's precedence to prove that the Honduran government condones the violence against him and his family, nor that the Honduran government is, quote, completely helpless to protect him. This court previously has rejected a heightened refusal to protect standard, in both the Valdezio-Galdamez First Opinion and in Cordozo, and we respectfully submit that this court likewise should reject a heightened complete helplessness standard here. But both those prior decisions were before the Attorney General's decision in INRI-AB, right? They are before the Attorney General's decision, but that decision is not entitled to this court's deference, Your Honor. The court's opinion would only be entitled, or the AG's opinion in matter of AB, would only be entitled to deference under a Chevron Step 2 analysis in the Third Circuit, right? Here, we respectfully submit that it's not entitled to deference at all because the complete helplessness standard, nor condone, are reasonable interpretations of the statute. When the Immigration and Nationality Act was amended with the Illegal Immigration Responsibility Act and Immigrant Responsibility Act of 1996, the INA was amended to include the language, quote, life or freedom would be threatened. That language was pulled directly from the Refugee Act of 1980, where it had long been understood in both administrative and judicial opinions to incorporate the unable or unwilling to protect standard. As the Supreme Court has consistently held, when Congress takes language that was previously used and reenacts it verbatim in a future enactment, the language takes with it the prior soil. And that's the case here. Life or freedom would be threatened means, Congress is presumed to have means, that that language means unable or unwilling to protect. In matter of AB, the Attorney General used the language condone or complete helplessness and indicated the meaning that he wished to be ascribed to those terms beyond... Oh, yes, Your Honor. He didn't make that up himself, right? He found that from other cases that existed at the time period that you said it was well understood that it only meant unable or unwilling. So he cited, I believe, a Seventh Circuit case, and that Seventh Circuit case wasn't a lonely case. I believe there was other cases that used the same articulation. The Seventh Circuit case to which you refer, Your Honor, the Galenus case, it does appear to be the root of this language. But the Seventh Circuit used that language exclusively in Dexia and ultimately determined the Galenus case under the traditional unable or unwilling to protect standard and reversed the BIA in that case. But there's no rule that says that the Attorney General can't, in interpreting an ambiguous statutory phrase, use dicta that another circuit used as favorable to guide the exercise of agency expertise in this space, right? I would say that is correct, but the Attorney General cannot, in the act of interpreting congressional language, change its settled meaning. And Congress is under the clear presumption... Only if it has one clear meaning. If it's capable of multiple meanings, then the Attorney General, in his exercise of Chevron deference, can pick between those meanings that would be permissible. Step two of Chevron focuses on permissible, which also doubles as reasonable. But if there's an array to pick from, as long as the Attorney General is picking one that is permissible or one that is reasonable, that's at his or her discretion, right? Your Honor, we respectfully submit the alternative, if you wish to put it that way, that the Attorney General selected is not permissible, nor is it reasonable. Because the words unable or unwilling, under a basic textual analysis that this Court is to perform, not the Attorney General, when determining whether or not the complete helplessness standard would be reasonable, that's a totally different heightened standard. The words unable or unwilling are not equivalent, under a dictionary definition, to helplessness, let alone to complete helplessness. To complete helplessness is a much higher burden, particularly given, as the Attorney General... All right, let's assume we agree with you on that. Let's assume we don't agree for a minute. Yeah, sure. Let's assume we don't agree for a minute. Black says that condone means to voluntarily pardon or overlook. How is that different from unwilling? And then the second question will be, how is completely helpless different from unable? If the transmission on my car breaks and I can't drive back to Pittsburgh and I can't fix the transmission, I'm completely helpless to get that car back to Pittsburgh. How is that different from unable? Okay. So, I may be unable to do something because I don't currently have the resources to do it. I would be completely helpless to do it if it's impossible for me to obtain those resources. So, I would say that would be a higher standard. With respect to condone, that's just an active choice by the government to condone it. We hereby say this is appropriate and this is what we're going to say is appropriate in our country. So, someone can only condone through express action? Is that your theory of condone? You can only condone if there's an express action that manifests that condoning. I think that would be an appropriate understanding of the term, yes, Your Honor. If one of my kids steals toys from, you know, his friends when they're playing and I don't do anything about it, have I condoned that action? Do you know about it at the time? Yeah, I watched it. Then the express action that you took was to take no action. So, then yes, you would have condoned that action. Express action can actually be an action? If it's knowing, yes, Your Honor. Well, then maybe these standards aren't that heightened. Okay. So, a complete... That gets back to where I was. Go ahead. Which is, this isn't a case where the agency referred to the condone or completely helpless standard supplanting. There was nothing explicit saying that those words referring to the AG's decision in AB supplanted the familiar unwilling or unable standard, correct? That is correct. And, in fact, the agency's articulated reasons for its decision made repeat reference to the unable or unwilling standard, correct? That is also correct, which, Your Honor, I believe makes us similar to your concurring opinion in Valdezio 2 where deference is not due, where an agency changed the standard but didn't recognize or explain that change. Okay, all right. All right, let's say we agree with that. Why should we say... Well, I guess I'm asking, why should we disregard the agency's statements about our unwilling or unable? Why shouldn't we just look at the facts of this case and ask this question? Did the Board of Immigration Appeals err when it said or concluded that the Honduran government is not unwilling or unable to push back on its decision? To push back against the 18 gang? Your Honor, we think that my client should prevail in its petition either way. There was not substantial evidence to support the holding that the government was not unable or unwilling to protect him. So, I'm sorry to interrupt, but let me just tease out that point and make sure I got your position exactly right. There are two parts of the BIA decision as I read it, and you may know it better than me, so maybe you'll find others, where they basically reference this, what you're calling the heightened standard, the complete helplessness and the condone. There's two sentences, that's all I can find, and the rest of it talks about unable and unwilling. Just for purposes of taking an issue off the table, if for some reason the BIA didn't include those two sentences, talking about condone and complete helplessness, then this would be a substantial evidence test under unable and unwilling. Substantial evidence case under unable and unwilling. Do I understand how this kind of litigation breaks out? If those sentences weren't in there, there'd be no argument that the BIA applied any form of heightened scrutiny or heightened test, and all that would be left would be a substantial evidence question as to whether or not there was substantial evidence of unable and unwilling. Do I understand the architecture correctly or am I missing something? I think the answer to your question must be yes. Had the BIA not articulated a heightened standard of condone or complete helplessness, the legal standard question would not be before you, and rather it would be a question with respect to substantial evidence. So it really comes down to the meaning. So the predicate question is the meaning of those two sentences. If those two sentences do effectuate a heightened standard, then we have to examine that. If those are read to be in conformity with the unable and willing standard and operate no difference to that, then we're still back at substantial evidence. I believe that is right. Big if, but yes. I mean, the terms are different. I think if you read matter of AB, it is clear that the Attorney General was indicating that the... Yes, Your Honor. So what if those two sentences of the BIA decision are just read as pure dicta, as not doing any operation, no heavy lifting, they just happen to be extra sentences along the way, and we don't read them as anything, then the if gets a little smaller, right? I'm not sure that this question of whether the court could read them as pure dicta. Obviously, that is up to your decision. But I mean, it appears to be the operable language that animated the decision. It seems impossible to me, frankly, that someone could look at the facts that we have in this case and the fact that the IJ and the BIA found that there was a clear probability of future harm on these truly extreme facts and yet nonetheless conclude that the Honduran government is able to protect Mr. Galeas-Aguirre. That's plainly not the case. Let's look at some of the facts on this question of whether there's substantial evidence supporting the agency. Isn't it the case that we can't consider events prior to Figaro's 2011 deportation because of collateral estoppel? Actually, Your Honor, I would respectfully submit that collateral estoppel applies to issues and claims, not with respect to facts. But even if you look only at the facts that the BIA and the IJ considered in this case, one subsequent to his return, he was threatened with a death threat directly. His mother received a death threat against him. His children were threatened with kidnapping. His home was shut up. Okay, but we're talking about unable or unwilling. Yes. So whatever bad things happen to his family members are only germane if they're reported to the authorities. The authorities aren't supposed to be clairvoyant about what to investigate, correct? That would be important. That's an important point. Right. So let's focus on what... Let's go piece by piece by what the Honduran authorities were told after 2011 about the threats that Figaro himself or his family members faced. His mother reported the threatened abduction of his children. Okay, what year was the threat and what year was the report? I'll have to double-check the record, Your Honor, but I'd be happy to do so. Okay, what else? So you've got the threatened abduction of... I believe it was 2012, but I'll confirm. Threatened abduction of the children. Okay, and then what else? That is the only incidence that was subsequently reported to the police after he was returned, but, Your Honor, I would not agree with you that you have to ignore the prior information previously provided to the police. I mean, the police were already aware that his sister had been raped by the 18 Gang and that the 18 Gang had murdered his father, uncle, and two cousins. That evidence doesn't go away. Those facts don't go away. His sister was raped in the early 2000s and his father was murdered in, I believe, 2011, and the two cousins were murdered in the subsequent months thereafter. When his father was shot, first in the leg, he tried to move to a different city and was then with his brother that he tried to move in with a gun down in the streets. I mean, when his cousin reported that murder to the police, his cousin was executed with five gunshot wounds to the head. His other cousin reported that murder. There was no investigation that took place in the subsequent months thereafter. And those were prior to his 2011 removal? They were prior to his first asylum discussions, yes, Your Honor. All right. All right. Thank you, Ms. Koehl. We'll hear you on rebuttal. Yes. Ms. Lee. Good morning, Your Honors. May it please the Court, Jenny Lee on behalf of the respondent, the Attorney General of the United States. The Court should dismiss the petition for review under the Fugitive Disentitlement Doctrine. Oh, boy, I was afraid you were going to say that. Court order, right? It has to be a court order. This isn't a court order. These are executive official mandates. Is there any case law to support that? Yes, Your Honor. Where? In the cases that were cited in my motion. Which case? I would have to look at it, Your Honor. But I'd be happy to. I'm not aware of cases enforcing the Fugitive Disentitlement Doctrine other than cases involving court orders that are disobeyed because the purpose of that doctrine is for the court's legitimacy. The principle, and correct me if I'm wrong, but the principle is that a person who ignores the orders of a court to appear in that court will not be heard to make arguments in that court. That is correct, Your Honor. But the petitioner in this case is a fugitive of this court and has no proceedings. The court has taken action on petitioner's stay request based on his own request and full pleadings. And when the court denied his stay, Immigration and Customs Enforcement asked him to appear, which he was required to do under his order of supervision, which is found at DHS ROP 44, where part of the condition of his order of release was that he was to appear in person at a time and place and DHS asked him to appear after this court denied his stay request. Then when he didn't show up, DHS asked his bond obligor to procure him and then he absconded. Discretion should not be exercised in his favor in this case. So you don't know where he is now? I do not know, Your Honor, and DHS or ICE will have to expend valuable resources to locate him because he refuses to appear at DHS as required. As he agreed to do. So I guess what you're arguing is that it's not just the executive order from ICE saying we need to see you, it's an order of this court denying the stay that he's disregarding. That is correct, Your Honor. And again, with regard to discretion, he doesn't merit a favorable exercise of discretion for his case because he has a history of showing to this court that he is not, by the U.S. laws, nor an unfavorable ruling by this court. Petitioner is subject to reinstatement, which means he previously illegally entered the United States, he had an asylum withholding hearing, was denied, he was ordered removed and actually removed and when he was removed, he was prohibited from returning to the United States for five years and yet knowing all of that, he illegally reentered. This shows an absolute disregard for the court's decision to use this court's procedures. He is the one that asked for a stay and when he was denied, rather than abide by the court's decision, he absconded. Respondent understands that the issue of whether condone complete helplessness is an issue of first impression and I guarantee the court that you will see this case... Let me just interrupt on this fugitive entitlement doctrine. That applies to all court orders, right? You don't have to be really disobeying a court order as opposed to a court not giving you the relief that you would otherwise want and then maybe going and taking it yourself but the court didn't say you couldn't take it yourself, maybe that was the operation of other law but it strikes me that don't you have to be in affirmative disobedience, not just not getting the relief from the court and getting it through some other means? I mean, what do you think? Well, I think that it shouldn't... it shouldn't matter whether it was a direct order from the court telling him that he must report. I guess what the court is saying that when he refused to report to ICE I should have asked for an order from the court of appeals? I think what I'm trying to tease out is if it wasn't for the ICE order, does the doctrine have any legs? It does because... So no ICE order. No ICE order. How does the doctrine have legs in this context? It has legs in the context because he is subject to be detained by ICE and yet they, through their exercise of prosecutorial discretion, allow him to be free. That's action by ICE, not action by court order. I'm trying to say there's no other flavor of activity ICE can do. Take that off the table and run me your fugitive disentitlement doctrine argument without anything from ICE, just from a denial of stay order of this court. Well, with the stay being denied, ICE is allowed to ask him to appear and remove him during the pendency. So from what I'm hearing it's just coupled to ICE. There's no way to do one without the other. I mean, that's fine if that's your point. I was just wondering if you had a point that suggested it had to be done slowly with court order. It would have to be coupled because the court's denial of stay does not automatically mean that he needs to show up to be free. Okay. While we go to the merits. Okay, sounds good. With regard to matter of AB, this issue will come up in another case where a petitioner is deserving of the court's consideration. This issue is not new in the courts of appeals as Judges Hardiman and Phipps indicated. Both, sorry, the courts of appeals in the 6th, 7th, and 8th have used this language before matter of AB was decided. And even after AB was decided, the 5th Circuit and Gonzalez Feliz stated in our 28J letter said, these two formulations accomplish the same purpose. To show that an alien's home government has more than difficulty controlling private behavior. The Attorney General did not come up with this formulation. Instead, he was just picking up on language that other courts of appeals have used since 2000. And all the courts that have used this language have used it interchangeably to mean unable or unwilling to protect. Petitioner reads that one sentence from matter of AB with the language condoning complete helplessness to propose a radical redefinition of the unable unwilling to protect standard. But the courts in the 5th, 6th, 7th, and 8th Circuit have all rejected such a reading. With regard to substantial evidence supporting the agency's  contrary to Petitioner's claim, the evidence shows that the Honduran government was able and willing to protect Petitioner and the record does not compel a contrary conclusion. Well, they weren't willing or able to protect his family. That's clear. Right? Yes, Your Honor. They were willing and were able. To protect his family? Yes, Your Honor. How was his father protected? Well... How was his sister protected? Yes, Your Honor. So, what we would have to do is we would have to look at the record of each police incident that was reported. When the sister was raped, they did name the alleged perpetrators. But, as the court is aware, rape cases are notoriously difficult to get to obtain arrests and convictions for. And nothing in the record suggests anything that the absence of the prosecution was attributable to anything aside from the lack of information. Going on to... Moving on to the father and uncle's murder, according to the record, found at 465, an investigative request was made on October 7, 2008. The police investigation report, which was dated November 3, 2008, found at 476, listed the procedures to be carried out, and which was to identify the accused with a name. Then finally, the report from the Court of Peace dated November 11, 2008, indicates cause of death. As cars involved, alleged perpetrators and cause of death are unknown. And that's found at 467. So here we have a request for a report, a police investigation report saying that they're going to take certain steps, and then third, there is a report from the Court of Peace. So, there you can see that it wasn't just... So when a family member is raped or killed, as long as the police do a report, that's satisfactory? Well... I'm just astounded you're making this argument. I thought your argument was going to be these issues that were prior to the 2011 removal aren't germane to the case because of estoppel. Well... Are you forfeiting that argument? No, the agency declined, the board declined to address the collateral estoppel issue, so I do not believe that I could rely on that to defend the agency's decision. So you're forfeiting collateral estoppel? Didn't the I.J. reference it? The attorney... Sorry, the immigration judge did, however the board specifically declined to address that issue in its decision. Okay. And you're saying we're not allowed to look to the I.J. decision? Oh no, of course, the court is allowed to look at the immigration judge's decision because the court is able to look at both the immigration judge's decision and the board. But for the unable and willing, I would... So what did the board say about events that happened prior to Figueroa's 2011 deportation? They discussed it as well. And so with regard to the father and uncle's murder, we can see that the Honduran government was doing something. Instead of just taking a report. With regard to his cousin's murder, the police investigation request made on January 1st, 2010, found on the record 477, it lists the procedures to be carried out. We don't know what happened after that because there's an absence of proof. Petitioner didn't provide the records to show what happened after these investigative reports were made. And finally, with regard to the kidnapping threat, Petitioner testified that the kidnapping threat happened in 2013. His mom made the report to the police in 2017, indicating that the call happened in 2015. It is not baffling that the police was unable to obtain an arrest when a span of four years happened after a phone call, even if they had the name of the person. So you take what the Honduran government actually did in his case with the country reports, which indicate that the Honduran government as a whole is battling the gang problem. They are trying to reduce homicide rate and kidnapping as well as fight corruption. What Petitioner asked the court to adopt in this case is a results-based test. These crimes happen so the Honduran government is unable and unwilling. But that can never be the standard, and no country could ever meet that. It can never be the standard. I mean, how long a series You're saying no matter how long the series is, that could never suffice for unable or unwilling? What if it was, what if the acts of violence were multiplied in this instance by three or by five? You're telling us that even that wouldn't be enough to sustain unable or unwilling? That would be a more compelling case, but But you said never. No, but that's the case that I'm saying that's the standard that Petitioner is asking for, that if you have crimes that are not solved, that you could never show that the government was able or willing. So what we look for to see if a government is unable or unwilling is to see what is the government's duty to protect its citizens. And if a crime is reported, that would mean that they would probably, they would need to invest, take a report, investigate, and prosecute if possible. But it's not always possible because there are failures, there are many ways where a prosecution is not I guess another way of getting at my question is how many failures to prosecute are needed before we're comfortably within the unable and unwilling under the substantial evidence, which is differential. But how many do you need? Because this one has, as your opposing counsel led, very tragic and dramatic facts. There's more than one. So how many do you need? You're saying this isn't enough? I'm saying it would have to be on a case-by-case basis. In this case, it's not enough because we only have four police reports and what the police did in those cases. Is it a quantitative test, like how many incidents, or is it qualitative? You look at what the government actually did to try to solve, to try to address these problems. I believe it should be a qualitative test. Or is it a combination? I believe it should be a qualitative test. And of course, the more numbers you get, the more difficult it becomes looking at the numbers. But here we know that the Honduran government did not lose sufficient control over its law enforcement so that you could arguably say that the country was unwilling and unable to protect the petitioner. I want to go back to the AB legal standard for a minute. Sure. Is the government's position that unwilling and unable is equivalent to condones or completely helpless? It's all the same? Yes. The government's position, it means they could be used interchangeably. It all means the same thing. The Attorney General in AB used six different formulations. They were all used interchangeably and he only used condone complete helplessness once. But again, they mean the same thing and they do the same thing. But when he used that, he used it in very, very emphatic terms. He said must show as if this is really a reduction of the test to one inquiry. I mean, are we supposed to read that must as may? Well, that must is read in the sense that everything else must be shown for unable and unwilling, that you have to show, that you must show that the government was unable and unwilling to protect, that you must show that the government was unwilling or able to prevent misconduct, that you must show that the government was unable or unwilling to control, and so forth. So you have to read it that way, that the terms are to be used interchangeably. If they're interchangeable, are they operating at the highest, most strict version of that, which is condone or complete helplessness? Well, based on the way the courts of appeals have discussed this language in the past, I would say that they would all be used on par. On the same plane, and then we have to decide that plane, and apparently, if it's, the majority of the cases go with a lower plane, just unable and unwilling. Some go with this higher level, complete helplessness. So we have to pick between which, so you want them all on the same plane, but they haven't been all decided on the same plane, so we have to pick which plane, right? I believe they have been decided on the same plane. The language has been used interchangeably by the courts. Okay. For the purposes of withholding, of removal, is this court supposed to consider whether the Honduran government was unable or unwilling to control the 18 gang at the time of the IJ hearing, at the time of the BIA hearing, at this moment, or do we look back to whether they were unwilling or unable to control the gang in 2008? We would look at the time of the hearing before the immigration judge. Okay. So if this court were to look at the grievous facts of what happened to petitioner's father, uncle, and sister over a decade ago, and conclude that at that time, the Honduran government was unwilling or unable to control, it would still, under your view, it would still be unavailing to petitioner if at the time of his hearing, in this case, the government was able and willing to control. Is that your position? That is correct, Your Honor. Okay. And has that issue been, I'm not familiar with case law, sort of explaining for us whether past failures to control non-state actors can influence a hearing that happens many years later? Are you aware of any cases that address that issue? Unfortunately, Your Honor, I wish I was, but I am not. Okay. So what's the basis for your argument that the measuring time, the moment of measure, is at the time of the hearing rather than these historical facts that opposing counsel articulated? That is my understanding of how asylum, or with the protection law works, and if there were to be changed country conditions to show that the government is now unable or unwilling, then they would file a motion to reopen based on changed country conditions. So it's a two-way street. It doesn't just benefit the government, because if things get worse, then it benefits the petitioner. If things get better, it benefits the government for purposes of unwilling or unable to control. That's correct, Your Honor. It's always a two-way street, because it's our protection law. We're trying to protect the refugees of the world. Okay, Ms. Lee, thank you. We'll hear the rebuttal of Ms. Kummer. Would you mind starting where we just finished? Is it Ms. Lee right that the question of when the Honduran government is unwilling or unable to control non-state violent actors like the 18 gang is the time of the hearing, not 10 years ago, 15 years ago? I think that's right, but there's been no demonstration in this case that there were any changed country conditions from when the father was murdered Well, the government's relying on the 2016 country conditions report, so why don't you address that? Yes, Your Honor. The 2016 country conditions report, I would submit that this court should read that report under the general, the specific terms, the general rule. While it does have some comments that the government was trying to control crime, it specifically states that the 18 gang continues to commit murders, extortions, and kidnapping, and that corruption and impunity remain serious problems within the police who were linked with the gangs. And what the BIA did not consider, nor did the IJ, were the numerous other similar governmental documents that are in the administrative record, including a UN High Commission on Refugee Guidelines, which states the 18th gang's identity includes extreme and cruel violence, a U.S. Department of State's Overseas Security Advisory, which says the 18th gang is not reluctant to use violence, including murder for hire, and those were also both 2016 documents. How did those acts of violence carry your burden? I mean, the 18th gang commits acts of violence in this country. Is it your argument the United States government is unwilling or unable to control the 18th gang? Of course not, Your Honor. My argument is that if you're going to look at broad statements in a country report to say the government took some actions to control, you need to look more narrowly at the exact targeted and individualized threats in this case, which is what this court discussed in the Lee case, when it said it's the individualized risk to the petitioner that matters. Now, these other governmental documents support the idea that the 18th Straits gang has not changed. The country conditions haven't changed with respect to its violence. But what I think is key here is that... So... Yes, Your Honor. Sorry for interrupting, but so is it your position that without an individualized determination, if we just look at the part of the country report that shows that there is an effort by the Honduran government to control the 18th gang or gangs in general, I think, isn't that... You're saying without something else, an individual determination, it's impossible for there to be substantial evidence in favor of the BIA's conclusion? I think that because the country report itself specifically states that the 18th gang continues to commit murders and is linked with the police and that they continue with corruption and impunity,   substantial evidence in support of the IG and the BIA's position. But more importantly, the substantial evidence... Well, it shows the 18th gang is still a problem. It shows the 18th gang is still a problem, but still being a problem is different than unable or unwilling. That's right. I think in this case, there is a wealth of evidence that they are unable or unwilling to control or protect Mr. Galeas Taguera and his individualized situation. So the question becomes wealth of evidence versus substantial evidence. And is there sufficient substantial evidence in support of the BIA's decision? There can be... More than a scintilla. Is there more than a scintilla? I don't think that there is. The BIA concluded that there was a clear probability of future harm to him. And the evidence in this case demonstrates that there has been no action, no investigation, nothing by the Honduran police to protect him and his family. I think the... I wanted to make two points, Your Honors. One is that as the government just conceded, the BIA considered the entire record, including the pre-2001... pre-2011 evidence. And so this court likewise should do so. And with respect to the dates, the rape was in 2001 and the father and uncle were murdered in 2008, the cousins in 2010. But nonetheless, the BIA considered that evidence, so so should this court. And second, the government has misstated our position. We certainly are not saying that if a crime is never solved, therefore, you absolutely need the unwilling or unable to control test. That is not our position. This court has twice specifically held that failure to act on police reports is circumstantial evidence that goes to unwilling or unable to control in both the Valdezio-Valdez decision and in Mendoza-Oronis, where this court granted the petition for review and granted withholding of removal. And we respectfully submit that's the appropriate result here, and we ask that the court do so. I have another question. Please, Judge Porter. In your brief, when you were criticizing the government's condoned or completely helpless language, this is on page 28 of your brief, you said that this court and others have repeatedly emphasized that what matters is a government's ability to, italicized, effectively protect an applicant. And then you cited a bunch of cases, and I think you must have been characterizing rather than quoting, because I didn't see that word effectively. But my question is, that, to me, seems like the change of a standard to say that a government has to effectively protect applicants. How would, between the three of us or all the courts around the country, how could we agree as to whether a foreign government is effectively protecting its citizens? That sounds like a higher standard for that foreign government to satisfy than the unwilling or unable standard. I believe what we intended to relay was the government must be able to affect protection and is not, therefore, unable or unwilling to protect. And just as a statement with respect to whether it is unable or unwilling, and I would say... So it's another way of saying unable. They're able to do it. We intended to say that's another way to say unable. If they were able, they would be able to affect protection. But here, as they are unable to do so, they cannot affect protection. What if they do it, but not very effectively? Well, here they didn't do it at all. So I think that that's a separate case. And it would be on the fact that that case, Your Honor, I can't necessarily speak... It's certainly not the case here where there's no investigation. You said they didn't do it at all here? There's no evidence... What's the it? I mean, this gets tricky because, I mean, there are many, many steps in the process of investigation, prosecution, and conviction, right? The only evidence in this case, Your Honor, is that on a few occasions the police took down a report entitled Police Investigation Request. No evidence that they ever did any actual investigation. There were no arrests, and nothing subsequently ensued. And as the record clearly demonstrates, and as my client testified, the police took no action. And that is evidence in this case that was found credible by the IJ. They did nothing to protect his family, and indeed, retaliatory murders occurred. And that's the basis for the death threats that he has repeatedly received. Was an arrest order ever made in the instance of the rape of his sister? No, there was no arrest order. There was a report of the rape. In that one instance, there was an arrest order, but no arrest was made. But I believe there was almost a conflation between whether there was the arrest order at some point of the intake report. But not subsequently. Thank you, Your Honor. That's a good clarification. So, at least get the point there was an arrest order. I mean, that's not nothing. It's not an arrest. It's not a prosecution. It's not a conviction. But it's more than nothing, I guess. We have to at least start with that, right? I think we have to start with the facts as they are before us, which is that subsequent to that rape, you know, his father, uncle, and two cousins were murdered, and he's received multiple death threats. All four of his brothers are in hiding because they've been threatened by the same gang. And that Board of Immigration of Kegels found there was a clear probability that he, too, would be likely harmed if returned to Honduras. I mean, he is likely to be murdered. That's where we are. And there's no evidence the government can do anything to protect him. They are unable or unwilling to do so. Thank you, Your Honor. It's even stranger, the mother was seeing a gang member after her husband's murder. Did I read that right? You did read that right. And I have to say, I mean, my client even seemed confused by that choice that his mother made, if you were reading his evidence in the testimony. But he seemed to suggest perhaps if she were dating a gang member, maybe she would receive protection from the gang. That turned out not to be the case as they then shot up her home, and she had to flee from the gunshots being fired at her home, and she broke it off in that relationship. But his mother's personal decision in that choice is certainly not as plausible, although I would agree it's quite an odd one. Yeah. All right. Ms. Kummer, are you and your firm appearing pro bono? Yes, sir, we are. All right. The court thanks you for your pro bono assistance. We thank Ms. Lee as well for your argument. Thank you. The briefing was extremely helpful, and the court will take the matter under advisement. Thank you.